And good morning again, Your Honors. And if it may please the Court again for the record, my name is Asparas Kanyan, and I do represent the petitioner Andranik Kantourian. In this case, again, Mr. Kantourian applied for asylum, withholding, and convention against torture based on persecution because of his religion as a Jehovah's Witness in Armenia. In this case, the petitioner did not have any attorney representing him at the hearing. He appeared pro se, and the whole entire hearing was conducted. What was the situation? There was at one point an attorney named Balajian that was involved in some of the prior hearings, and then you were involved at some point. How did this course of representation work? Asparas Kanyan I represented Mr. Kantourian before the BIA, not in front of, at the court, at the merits. Mr. Balajian, who also works with me at times, did the Ninth Circuit brief, and I decided because I was going to be here and I was familiar with this case, I decided that I would argue this case. So you know that you're required to let us know that in advance? I did mail a notice of appearance to San Francisco. I was told to mail it to San Francisco, which I did. I apologize if it's not... That's not a problem. I just want to be clear that, so at the hearing, your client was pro se? Yes, we didn't know him at that time. He only came to my office when he was denied asylum. I did the brief on the BIA. His hearing was pretty brief, and immigration judge's decision was very brief too. The judge found them incredible because of a few notes, one being that he had testified that the meeting was being held at the house when the police invaded the house and arrested them. The I.J. basically says that based on the State Department report, there's no harassment in private homes in Armenia of the Jehovah's Witnesses. Now again, this is a generalized State Department report, and second, the incident happened in 1998. This country report is 2002 country report, and the hearing is being conducted in 2003, so we can't really rely on the State Department country report for that. May I ask you about a different ground that the I.J. based his credibility determination? One of them was that the petitioner wasn't credible because he didn't attend Jehovah's Witnesses services in the United States. That wasn't an issue that was challenged by you either before the BIA or in your brief on appeal. Is that issue then not exhausted? So can we not reach that? Well, he did testify that he was not attending the Jehovah's Witness meetings because he That is what is in the record, so we can't really challenge that. But if there's a past persecution, that does not stop future persecution because he does not attend Jehovah's Witnesses, or it doesn't make him incredible if he doesn't attend Jehovah's Witnesses meetings here in the United States. The question is, was there a past persecution, and was he credible on the past persecution? Well, I take it that the I.J.'s theory was that Mr. Kenturian wasn't truly a Jehovah's Witness, that it was just a ruse for immigration purposes. Well, there was no evidence to that. Basically, it was speculation because basically the judge was saying you don't attend Jehovah's Witness meetings here in the United States, so then you were not Jehovah's Witness back in Armenia, which is not true. It's speculation. So the country report in this case is 2002. It's the same country report as the one in the prior case, and both of them support that Jehovah's Witnesses, especially to the extent that their religion requires them to proselytize, are persecuted. So again, I want to go back to the individualized persecution in this case. Well, again, the State Department report does not, it's a generalized report. Right, well, I mean, it supports your case. I know that the immigration judge said it didn't, but it actually does, if you read from it. Mr. Kantourian had testified that in 1995, while he was in a park, he was arrested. They were having a meeting in a park, a Jehovah's Witness meeting. He was detained for two days and was beaten during detention. Then also in 1998, he was, while there was a meeting at a member's home, they were arrested again. He was detained. I believe again it was two days, and again was beaten for those two days. Okay, so then, and Judge Ikeda raises the point that before the BIA, you failed to appeal two issues, that the failure to attend services, which I gather your position on that was that you thought an adequate explanation of that was given, because he couldn't get a ride. And the second one is that the IJ found that the blood, that he gave blood in violation of alleged Jehovah's Witnesses' beliefs for a medical test, but in point of fact, we know that the Jehovah's Witness religion only prohibits blood transfusions, not giving blood for a medical test. But you didn't make that argument either, right? No, but the thing is that there was no evidence to show what the practices or beliefs of the Jehovah's Witnesses is or was at that time. There's no evidence to that. And the judge did not take any judicial notice of anything to indicate that Jehovah's Witnesses do give blood for tests or do they give blood for transfusions only. So we don't really know what the practices are or beliefs of the Jehovah's Witnesses, because there was no evidence in the record. But the judge is making a credibility determination. And so you talk about past persecution, but if the judge determines that the petitioner is not credible, then he doesn't have to believe the past persecutions either. On this traveling to the services, the judge says something along the lines that Mr. Kantourian risks life. He alleges that he risks life and limb to go to services in Armenia, but when he comes here, he doesn't bother. And yet you don't challenge that or give some basis for why the IJ's determination that that shows the petitioner is not credible is not based on substantial evidence. Well, unfortunately, I'm saying there was no attorney at his hearing, nor did I represent him at the hearing. And unfortunately, there's nothing in the record to contradict what the judge is saying. I'm not saying what the judge is saying is correct as far as legally, but factually, it is correct. My argument is that there is past persecution, and once he's found to be past persecution, there's a rebuttable presumption of future persecution and the government has to rebut it. But how do we get past the adverse credibility determination? Well, that's the – I think the issue is the adverse credibility issue. And I think that by him testifying – the judge found him incredible on two reasons. One, because he gave blood. Second was that because the – I couldn't remember if the wife had been arrested. Well, he wasn't sure this was eight, ten years ago that he wasn't – he said she might have been detained, arrested, and released, but wasn't detained like for a day or two. So that was like almost eight, ten years ago, the incident that happened. So I think that's a minor inconsistency. The other thing that the judge relied on was that the country report indicates that private witnesses are being gathered and conducting their services. And that was done a couple of years after this? I'm sorry, Your Honor? Was that report prepared a couple of years after the incident? In fact, the incident happened in 98. The report is for 2002, and the hearing was conducted in 2003. So the report was not accurate. So we – I think we have to find this person credible. Now, if it goes back to the I.J., then we have to see if there's any future persecution. That would be a decision for the I.J. to make if the witness is credible. If the witness is credible, then the government has to rebut the presumption by showing that this person – And we have to go back to the I.J. for that? That's correct. So the issue for us is whether the I.J. was correct in finding him incredible. That's correct. If this court finds him to be credible, then there is past persecution because there are – Well, I think the I.J. never did find that, did he? Well, yes. That's correct. The judge said he's not credible. Yeah, it just goes back to the hearing, then, on the merits. Exactly. Now, the judge – I don't know if by him being silent on that issue, because there's a lot of I.J.s who would say, even if he's found credible, there's no persecution. But in this case, the judge never spoke on that issue. So it just basically said that this person is not credible. Thank you, counsel. Thank you. You're up, John. Good morning again, Your Honors. My name is still Jeffrey Bernstein, and I still represent the Attorney General of the United States. The first thing I'd like to do is take issue with the assertion that the State Department report supports Mr. Kantarian's claim. The State Department report does not. It does say that arbitrary arrest and detention by police are common. That's something I don't understand. I'm looking at the – it's the same report in the two cases. It is. But it supports – I don't know if I just have different pages in the excerpts, but – Well, there are very few pages on Jehovah's Witnesses in that report. It does say that there's prohibition on proselytizing, but it also says that that prohibition is not enforced in practice. It does say that there are a number of young men of draft age who have been imprisoned and have been on trial for refusing to serve, and they're – because of their religion, Jehovah's Witness religion apparently precludes them from serving. But there's nothing to indicate that somebody in Mr. Kantarian's position, just a general guy who allegedly is a Jehovah's Witness, is going to have any problems whatsoever in 2002. So I think that it is a stress to say that the State Department report supports Mr. Kantarian's claim, assuming that he's credible, which he isn't. And Judge Okuda's question, I think, was the point that I was going to start off with, that the immigration judge made a number of adverse credibility determinations which have never been contested, either before the board, failure to exhaust, or before this court, waiver. The petitioners never contested the determination that his credibility was undermined by the fact that he, as Judge Okuda noted, the immigration judge said, risked life and limb to participate as a Jehovah's Witness, yet he comes to this country. He doesn't join a church, a Jehovah's Witness church, and the immigration judge drew the inference that he had never been in a Jehovah's Witness church in the United States, or attended a service, and that inference is supported by Mr. Kantarian's excuse that he couldn't get a ride. And of course, Mr. Kantarian has never contested the immigration judge's determination that that excuse doesn't really hold water, because he did get a ride for a very important event in his life, his asylum application. So, assuming that he risked life and limb to practice as a Jehovah's Witness, that would indicate to me that being a Jehovah's Witness would have been very important to him, and yet, he could get a ride for an important event, but he can't get a ride to the church? Your best argument on that is that it wasn't exhaustive, because it seems to me that if the question is getting a ride to your immigration hearing where you could possibly be deported in absentia, it would be a very much more important thing than getting a ride to regular, you know, I know it's a value judgment. It's your value judgment. Perhaps it's the IJ's value judgment, but it may not be the same value judgment for everybody. Well, I don't think so. Some people, I mean, some people who have strong beliefs believe that religion, you know, expressing their religious beliefs is just as important as staying in the United States. And, you know, I think... But weekly rides, excuse me, counsel, weekly visits to church might be harder to get a ride every week as opposed to a single important event. I mean, I think he lived in an area where there's public transportation. If he was truly, I think it's a reasonable inference that if he was truly interested in practicing Jehovah's Witnesses, he would go to church every year, if not once a week. And I think it certainly doesn't establish beyond peradventure that he wasn't credible, but I think it is an indicia that he's not telling the truth. Just as leaving his wife and then 11-year-old child in Armenia when his wife was a Jehovah's Witness and he testified that she was subject to the same danger as he was, just as leaving them in Armenia in such dangerous conditions, going off by himself rather than sending them and him staying, is an indication that perhaps he did not really fear persecution in Armenia because of his religion if he was a Jehovah's Witness and his wife was a Jehovah's Witness. Mr. Bernstein, I think what you're arguing is that he's waived these various issues because he did not object or make the argument earlier to the IJ? I'm certainly, yeah. Or BIA? Well, to the BIA because he's required to exhaust to the BIA, yes. So you're saying that he's now arguing that there was an improper finding that he was incredible for these various reasons and the IJ was not sufficiently informed or whatever to make those decisions of incredibility or improperly reasoned. And you're saying, well, he can't make those arguments here because he didn't make them to the BIA. Is that your Well, that's certainly a component of my argument, yes. Yeah, he's waived it. He's failed to exhaust those particular issues. Suppose he didn't waive it and it's possible for him to make those arguments here. There's really been no evidence, at least from his part, of explaining why he couldn't get a ride to the church, for example. He just said he couldn't get a ride. Exactly. I mean, if the court can consider them, as I've just been explaining or arguing, they were perfectly appropriate matters upon which the immigration judge could find that he had a lack of credibility. They were certainly central to his asylum claim because central to his asylum claim is that he's a practicing Jehovah's Witness. This all goes to the point that he should have argued them and didn't. Is that right? Well, that goes to the point, if you have jurisdiction to consider it, then you should sustain the immigration judge's credibility findings based upon those matters. Because? Because they're reasonable, they're cogent, they're reasonable, and they're central, based on matters central to his asylum claim. However, I'm also making the argument that he's waived them because he doesn't contest and that, in fact, the adverse credibility determination can be, even if the other two bases were improper, this Court has held that so long as at least some of the adverse credibility bases are proper, then it doesn't matter if others are improper. Is there any indication in the record as to where he lived or what available public transportation there was between his place and the church? I think, well, there's no, there certainly is, and I can't remember where he lived, but there certainly is on his asylum application various papers an indication of where he lived. I think he lived in the Los Angeles area, I think, and I can't imagine that some kind of transportation is not available. I mean, Jehovah's Witnesses seem to be very friendly people. Where do you live? I live in Washington, D.C. So what do you know about what transportation is available in Los Angeles? I've been to Los Angeles on a number of occasions. I've taken the bus in Los Angeles. I don't think you can be testifying to this. I'm not testifying. I don't know if this guy ever took the bus or not. Well, I don't know. All I'm saying is that it's a perfectly reasonable inference to raise and that if the immigration judge would have been perfectly, it was perfectly, it was perfectly appropriate for the immigration judge to determine that if he wasn't interested enough in his ability to join a church and practice that religion in the United States, then perhaps You didn't say he didn't join a church. That's what he said. He said he wasn't practicing. He says, no, not here. You're right. He says, I don't have a right. I can't go. No, I don't have the means. Otherwise, I would go with pleasure. That's what he said. So my argument is obviously that if you can consider it the perfectly appropriate basis for an adverse credibility determination, I think the determination that his testimony was inconsistent was also perfectly legitimate reason. I think there are many other indications that he was incredible. His attorney, who withdrew, didn't think he was telling the truth because he told the immigration judge that he had a meeting with him and he advised Mr. Kantorian that he should withdraw his asylum application, because if he didn't, he might be subject to penalties. And that indicates to me that the attorney wasn't sure that Mr. Kantorian was telling the truth. And, in fact, he asked to withdraw because he asked Mr. Kantorian to provide evidence that he was a Jehovah's Witness, and the attorney said he either could not or would not do so. Again, he has produced no evidence substantiating the fact that he's a Jehovah's Witness. This Court has held in Mejia Pes with respect to a Nicaraguan Jehovah's Witness that the inability to provide evidence that you're either a member of a Jehovah's Witness religion in Nicaragua or the United States is appropriately used to draw an adverse inference. So I guess your argument would be that the IJ properly found he was incredible in claiming to be a Jehovah's Witness, and his whole theory of entitlement to asylum was that Jehovah's Witnesses were persecuted, and since he hasn't established that he was a Jehovah's Witness, he failed in his asylum claim. Broadly, yes, and I think because he was not credible, the immigration judge, I think, went further and said, well, I can't believe anything you say, so you've made these detailed assertions regarding two events that happened to you, and they're based upon, as you say, Your Honor, the fact that he's a Jehovah's Witness, and I can't really believe that that stuff happened either because I just can't believe you for the various reasons which are both contested and uncontested in this case. Given all these matters, I think that the immigration judge's adverse credibility determination is certainly supported by substantial evidence. The Petitioner has pointed to no evidence which compel an opposite conclusion. Okay. Thank you, counsel. You're over your time. Thank you, Your Honor. All right. Kenturian v. McKay, as he's submitted, will take up. Oh, you are over your time. Well, okay, 30 seconds. If government counsel was talking about his previous counsel, Mr. McGuire, Mr. McGuire was disbarred, just for the record. Second, as far as waiving any argument, our argument was disbarred. Disbarred before the hearing or after the hearing? Not because of this case, but it was disbarred after this case. After this case. Okay. Second, as far as waiving any of the arguments, our argument was on credibility, so basically by raising the credibility issue, I believe we didn't waive any arguments on that. And lastly, as far as Mr. Kenturian not attending Jehovah's Witness hearings here in the United States, if you look at the record, in Armenia, he never attended any Jehovah's Witness meetings at the Kingdom Hall. So he was used to hearings at the houses, at the homes of the members. But the record, there's nothing in the record asking him if he had any meetings at the homes of members. So he was used to attending hearings, I mean hearing, apologies, meetings at homes, because there was no Kingdom Hall in Armenia. So I think that kind of helps the argument, that's why he did not go or join a Kingdom Hall, because that's all he did was go to members' homes and have prayers, and that's probably what he did. All right. So Kenturian v. Mukasey is submitted, and we'll take up Sargisian v. Mukasey. Thank you.
judges: Thompson, Wardlaw, Ikuta